**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**


WILLIAM H. CORLEW, JR.    )
      Plaintiff,         )
                    )      Civil Action No. 3:06-0221
v.                      )      Judge Nixon/Brown
                    )
JO ANNE B. BARNHART,      )
Commissioner of Social Security,  )
      Defendant.        )


To:    The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION


This is a civil action filed pursuant to 42 U.S.C. § 405(g) and 1383 (c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security denying plaintiff disability insurance benefits (DIB) and supplemental security income (SSI), as provided under Titles II and XVI of the Social Security Act (Act) as amended. The case is currently pending on plaintiff's motion for judgment on the administrative record. (Docket Entry No. 20). For the reasons stated below, the Magistrate Judge recommends that plaintiff's motion for judgment be DENIED, and that the decision of the Commissioner to be AFFIRMED.

## I.  INTRODUCTION

Plaintiff protectively filed his application for DIB and SSI on February 4, 2003, alleging that he became disabled on November 11, 2002, due to a back injury resulting from a motor vehicle accident on that date. (Tr. 15, 59-62, 282, 283-285). Plaintiff's claim was denied initially and upon

1

reconsideration. (Tr. 27-40). At Plaintiff's request, an administrative law judge (ALJ) conducted

a hearing on October 19, 2004 (Tr. 401-425). Plaintiff, who was represented by counsel, and Gail

Ditmore, a vocational expert, testified. (Tr. 401-425). On March 18, 2005, the ALJ issued a written

decision, denying Plaintiff's claims for DIB and SSI. (Tr. 12-24). The ALJ made the following

findings:

1. The Claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's history of compression fracture of the lumbar spine status post fusion, degenerative disk disease and depression, are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant retains the residual functional capacity to perform light work with no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling or crouching, no crawling or climbing of ladders, ropes or scaffolds, and the work must require no more than simple, routine, repetitive tasks (SVP 2 or less).

7. The claimant is unable to perform any of his past relent work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

2

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 201.28 as a framework for decision making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as an assembler DOT #735.687-022 (11,547 jobs in the State of Tennessee; 336,800 jobs in the national economy); clip fastener marker DOT #920.687-126 (1626;57,149); and hand packer DOT # 753.687-038 (5,517; 195,836).

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 12-24).

Plaintiff sought review from the Appeals Council and on January 17, 2006, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 12-24), thereby rendering that decision the final decision of the Commissioner. (Tr. 6-8). This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD[1]

Plaintiff was 41 years old at the time of the ALJ's decision (Tr. 21). Plaintiff completed high school (Tr. 86). He has past relevant work as a construction laborer, machine operator, roofer and saw operator. (Tr. 83-84).

On November 11, 2002, Plaintiff was involved in a motor vehicle accident. On November

---

[1]Plaintiff's counsel is urged in the future to use specific transcript references of the administrative record at all times. Further, blanket citations to 30 page exhibits in the record do not assist the Court. Additionally, Plaintiff's's counsel should proof documents before submitting them to the Court as this motion was replete with typos as well as references to Plaintiff's male client as "her" and "she."

3

15, 2002, Plaintiff underwent an anterior decompression and a fusion of an L1 burst fracture. (Tr. 157). Plaintiff was discharged on November 21, 2002. (Tr. 157).

On November 25, 2002, Plaintiff returned to the hospital emergency room complaining of shortness of breath. (Tr. 140-144). At that time, Plaintiff was found to have near complete opacification of his left hemithorax, with a CT scan confirming the presence of a large hemothorax (i.e. a pleural effusion containing blood). (Tr. 140-143). The next day, Plaintiff underwent a thoracoscopy and an evacuation of the hemothorax. (Tr. 140-143). On December 3, 2002, Plaintiff was discharged from the hospital, with instructions from his treating physician, Dr. Edward Mackey, to continue his rehabilitation program consisting of walking in his brace, but not bending, leaning, turning, twisting or sitting for prolonged periods. (Tr. 140-141).

Plaintiff's medical records indicate that Dr. Mackey continued to treat Plaintiff for approximately 7 months, until June 24, 2003. (Tr. 183-189). On December 9, 2002, Dr. Mackey noted that Plaintiff was "doing well" and "getting around quite nicely." (Tr. 187). On January 6, 2003, Dr. Mackey noted that Plaintiff's's "x-rays look great" and that Plaintiff's "only complaint was of some discomfort along his incision." (Tr. 186). On February 17, 2003, Dr. Mackey noted that Plaintiff had "no neurologic complaints, no back pain to speak of." (Tr. 185). Further, Dr. Mackey noted that while Plaintiff was still unable to do any type of heavy lifting, he could find a "light duty type job or sedentary type job" while continuing to work on progressive strengthening. (Tr. 185). On April 14, 2003, Dr. Mackey noted that Plaintiff, while still having abdominal weakness, was doing well with minimal back pain. (Tr. 184). Dr. Mackey also writes that "I have encouraged him to gradually return to full duty without restrictions." (Tr. 184). Two months later, on June 24, 2003, Dr. Mackey reported that Plaintiff was "doing okay. . .having a little bit of low

4

back discomfort. . .AP Lateral lumbar spine look fine.  The fusion of his burst fracture looks fine."  (Tr. 183).  Dr. Mackey concluded that,  "Symptomatically he is doing reasonably well.  No further recommendations for him.  Activities as tolerated."  (Tr. 183).  While a six month follow up was scheduled for the Plaintiff, there are no medical records in the administrative record indicating that Plaintiff received any further medical treatment from Dr. Mackey.

However, during his treatment by Dr. Mackey, Plaintiff attended 7 physical therapy sessions at Metropolitan Nashville General Hospital from March 6, 2003, through March 28, 2003.  (Tr. 249-272).  During Plaintiff's initial physical therapy evaluation, Plaintiff rated his pain as a two on a scale of zero to ten, with ten being the maximal pain.  (Tr. 261).  Plaintiff indicated that bending, lifting and having sex were activities which aggravated his pain.  (Tr. 261).  On March 28, 2003, Plaintiff's physical therapy discharge summary reported that Plaintiff had a pain level of one, the lowest minimal pain level on the scale and strength rating of 5/5.  (Tr. 249).

To develop the record, on August 1, 2003, Robert Lane, Ed. D, a licensed psychologist, evaluated Plaintiff's mental status, at the request of the Tennessee State Agency.  (Tr. 190-192).  Dr. Lane found Plaintiff was cooperative and pleasant throughout the examination, had no problem concentrating[2] and remaining on task, and had no difficulties understanding or following directions.[3]  (Tr. 190-192).  Plaintiff reported to Dr. Lane that he had never had any mental health problems and was not currently receiving any mental health services.  (Tr. 191).  Additionally, Plaintiff reported

---

[2]Dr. Lane noted that he found Plaintiff's performance in concentration limit, such as naming the months of the year in reverse order and performing simple mental calculations, was in the average range for his age group.  (Tr. 191).

[3]Dr. Lane noted that Plaintiff's decision making abilities were in the average range, and that his ability to understand concepts was in the average range.  (Tr. 191).

5

that he does not have any difficulties with his appetite, enjoys going to the movies, eating out at restaurants, and that he spends his days watching television, reading, listening to the radio, playing checkers with his son, and visiting friends. (Tr. 191). Further, Plaintiff reported that he regularly attended Narcotics Anonymous meetings in the evening and would then come home and make himself dinner. (Tr. 191). Plaintiff additionally reported that he attends church on Sundays. (Tr. 192). Plaintiff also reported that he manages his own finances, prepares his own meals, does his own laundry, bathes daily, makes his own clothing purchases, and runs his own errands by driving himself. (Tr. 192). Dr. Lane also noted that Plaintiff traveled unaccompanied in unfamiliar places and used public transportation. (Tr. 192). Additionally, Plaintiff reported that "he has been feeling angry for several years, has a problem maintaining socially appropriated behavior around other people, and he frequently forgets what he is told; this causes problems with supervisors." (Tr. 191). Additionally, Plaintiff reported that approximately twice a month, he would have "bad days" where he would stay in bed for 2 or 3 days and sleep 20 hours. (Tr. 192). Dr. Lane concluded that Plaintiff is "able to understand simple instructions, make simple-work related decisions, work with the general public and co-workers, accept criticism from supervisors, and maintain schedules and attendance." (Tr. 192). Lastly, Dr. Lane stated that, "Mr. Corlew has had a substance abuse problem since his teens, and it is not unusual for such an individual to have chronic problems with depression, relationships, and employment, as a result of the repeated use of and withdrawal from alcohol, marijuana, and cocaine." (Tr. 192). Dr. Lane diagnosed Plaintiff at Axis I with depressive disorder, not otherwise specified, with a prior history of cocaine, cannabis, and alcohol abuse; at Axis II with an antisocial personality disorder; and at Axis III with periodic back pain and high blood pressure. (Tr. 192).

6

In September 2003, Bradley V. Williams, M.D., completed a Psychiatric Review Technique Form (PRTF) and Mental Residual Function Capacity Assessment (MRFC) regarding Plaintiff's mental status. (Tr. 193-200). In the PRTF, Dr. Williams noted that Plaintiff had a mild limitation of his activities of daily living and a moderate limitation in his ability to maintain social functioning, concentration, persistence or pace, with no periods of decompensation for extended duration. (Tr. 196). Dr. Williams noted that Plaintiff had no problem concentrating or remaining on task. (Tr. 197). Dr. Williams opined that Plaintiff had depression, not otherwise specified, although Plaintiff had sought no mental treatment. (Tr. 197). In the MRFC, Dr. Williams found that Plaintiff could remember locations and work-like procedures, understand and remember short and very simple, as well as detailed, instructions, carry out very short and simple instructions, would be moderately limited in his ability to carry out detailed instructions, would be moderately limited in his ability to maintain attention and concentration for extended periods, could perform activities within a schedule, maintain regular attendance, be punctual within normal customary tolerances, could sustain an ordinary routine without special supervision, had the ability to work in coordination with or proximity to others without being distracted by them, had the ability to make simple work-related decisions, and would be moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 198-199). Further, Dr. Williams found that Plaintiff's ability to interact appropriately with the general public was moderately limited, as was his ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 199). Dr. Williams also found that Plaintiff had the ability to ask simple questions or request assistance, to get along with coworkers, maintain socially appropriate behavior,

7

to respond appropriately to changes in a work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (Tr. 199). Dr. Williams concluded that Plaintiff "could understand and carry out simple-detailed tasks while sitting along with others, and adapting at that level of functioning. Mood personality could limit response to criticism and p/c/c such that he could have trouble with complex task and dealing with public in more than simple situations." (Tr. 200).

On October 28, 2003, Plaintiff was treated by Dr. Donald Boatright with Plaintiff indicating a pain level of four. (Tr. 275). Plaintiff was diagnosed with scoliosis predominantly involving the thoracic spine as well as degenerative disc changes at the L5-S1 level and was given a refill of Accupril for his hypertension. (Tr. 275).

On January 14, 2004, Plaintiff again presented to Dr. Boatright, reporting neck and back pain and an inability to sleep at night. (Tr. 245). Plaintiff stated that his pain was uncomfortable but not unbearable and that the pain was not limiting his daily activities. (Tr. 245). Plaintiff had 4/5 muscle strength and was diagnosed with neck and back pain and given Celebrex for his pain. (Tr. 245). On March 10, 2004, Plaintiff reported experiencing continued neck and back pain as well as right knee pain and requested a referral to Dr. Mackey. (Tr. 244). Upon examination, the Plaintiff had a full range of motion of his knee and full flexion of his back. (Tr. 244). Plaintiff continued on Accupril for his hypertension, as well as Celebrex and was additionally given Indocin for his pain. (Tr. 244). On June 3, 2004, Plaintiff reported that he was having difficulty rising from his bed and was unable to do chores. (Tr. 241). Further, Plaintiff reported that he was very stiff and was hearing popping sounds. (Tr. 241). Additionally, Plaintiff rated his pain as 10 on a 1-10 point scale, with

8

10 being the worst pain, stating that his pain was triggered by lifting, breathing and laughing. (Tr. 239). Upon examination, Plaintiff had tenderness of the lumbar spine, normal reflexes and tight hamstrings. (Tr. 241). Plaintiff continued on Indocin and was started on Flexeril. (Tr. 241). Additionally, Plaintiff was referred for more physical therapy. (Tr. 241-242).

On October 15, 2004, Alvin Brown, M.D. completed a medical assessment of Plaintiff's ability to do work-related activities. (Tr. 278-281). Dr. Brown indicated that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk at least 2 hours in an 8-hour workday, and must periodically alternate between sitting and standing. (Tr. 278-179). Additionally, Dr. Brown stated that claimant was limited with pushing and/or pulling, could occasionally climb, kneel, crouch and stoop, and could frequently balance and crawl. (Tr. 279). Dr. Brown noted that Plaintiff had a fusion extending from T12 to L2 secondary to a severe compression fracture at L1 and he had a degenerative disc disease at LF-S1, which caused ligament laxity and predisposed claimant to easily re-injuring his back more so than a person with a normal back. (Tr. 279).

At the October 19, 2004, hearing, Plaintiff testified that after his wreck, he could barely get around and that he spent six months in bed. (Tr. 409). Approximately eight months after the accident, Plaintiff testified that he tried to work part-time as a cook at Shoney's but could not handle the work and had to rest two hours before and after work. (Tr. 409-410). Plaintiff also testified that he tried telemarketing for two days but that he could not keep the job as he was unable to move around when he needed to. (Tr. 410). Plaintiff reported that he fears going out and does not like to be around other people, will not answer the telephone, gets overwhelmed and quit taking psychotropic medications in 2001 because he felt paranoid and further, has not recently sought treatment for a mental disorder. (Tr. 412, 413, 417). Plaintiff testified that he has difficult having

9

sex, can sit only two hours at a time, spends his day sitting in a recliner or lying down, struggles to do laundry, is scared to ride in a car with other people, has groceries bagged lightly, prays and reads his Bible daily, and goes to Narcotics Anonymous meetings regularly. (Tr. 410, 411, 415, 416).

Also at the October 19, 2004, hearing, the vocational expert, Gail Dittimore, ("VE") stated that Claimant would be unable to perform any of his past work due to his restrictions. (Tr. 421-422). The VE was posed a hypothetical question and asked to consider an individual of Plaintiff's age, education and work history, who retained the residual functional capacity to perform simple, routine repetitive light work that does not require climbing of ladders, ropes or scaffolds, requires only occasional climbing of ramps and stairs, only occasional balancing, stooping, kneeling and crouching and no crawling. (Tr. 421). The VE stated that such an individual could perform the job of an assembler, numbering 11,547 in TN and 336,800 in the U.S. economy as well as other unskilled labor number 1,626 in TN and 57,149 in the U.S. economy. (Tr. 422). The VE further testified that such an individual could perform the job of a hand packer, numbering 5,517 in TN and 195,836 in the U.S. economy. (Tr. 422). The VE was then posed the same hypothetical with the additional criteria that instead of light work, the individual could perform sedentary work. (Tr. 422). The VE stated that such an individual could perform the job of cashier, number 1,500 in TN and 50,200 in the U.S. economy; cuff folder, numbering 1,084 in TN and 38,099 in the U.S. economy; and surveillance system monitor, numbering 1,450 in TN and 57, 100 in the U.S. economy. (Tr. 422-423). The VE was then posed the same hypothetical as the second hypothetical with the added limitation that the person would have a sit/stand option. (Tr. 423). The VE testified that both the cashier and surveillance system monitor positions would meet that criteria and that the available light assembler, cuff folder, and packer positions would be reduced in quantity but still available (Tr.

10

423).  The VE was then posed the hypothetical that the person was either physically or mentally

unable to work 8 hours a day, five days a week.  (Tr. 423-424).  The VE testified that there would

be no positions for such an individual.  (Tr. 424).

In approximately November 2004, Plaintiff was diagnosed with HIV and thereafter was

diagnosed with Hepatitis B.  (Tr.319).

From March 4, 2005 through August 2, 2005,with the exception of three days, the Plaintiff

was an outpatient at Comprehensive Care Center ("CCC") treated by Erlete Malveira Ascencao,

Ph.D., and Janice C. Duncan, MA, LPE, for a major depressive disorder.  (Tr. 373-388).[4]  On May

24, 2005, Plaintiff was transferred from the CCC to Middle Tennessee Mental Health Institute

("MTMHI"), after Plaintiff received a Lethality Assessment rating of 5 or above for suicide as well

as for anger management issues.  (Tr.312, 318).  Prior to this time, Plaintiff had no prior history of

psychiatric admissions or suicide attempts.  (Tr. 305).  Plaintiff received treatment for approximately

3 days, from May 24-26, 2005.  Plaintiff's records during this time indicate that Plaintiff stated he

was having auditory hallucinations, and had been for 20 plus years, of a man telling him to kill

himself.  (Tr. 329, 351, 352).  Plaintiff further stated during his initial psychiatric consultation and

assessment that he had a history of depressive disorders which also began over 20 years ago.  (Tr.

318).  On May 26, 2005, Plaintiff requested a discharge.  (Tr. 312).  Plaintiff was discharged with

medications that same day to his own apartment, where he lived alone.  (Tr. 312).  The discharge

diagnosis states that Plaintiff, during his stay, was under constant observation for suicidal ideation,

---

[4]This information was made available to the AC, not the ALJ.  The ALJ made his ruling
on March 18, 2005, two weeks after Plaintiff began to his treatment at CCC.  The AC made
Plaintiff's treatment records from 3/4/05 to 8/2/05 part of the record when determining whether
to grant or deny Plaintiff's request for review.  The AC found that these new records did not
provide a basis for changing the ALJ's decision and denied Plaintiff's request.  (Tr. 6-9).

responded well to medications, contributed to activities, was interactive with peers though somewhat guarded, was not a threat to himself or others, was cooperative and attentive, alert and oriented to time place, person and purpose, had an organized and goal oriented thought process, fair insight and judgment, and memory and registration at 3/3 and recall of 2/3. (Tr. 306, 307).

After his discharge from MTMHI, Plaintiff resumed his treatment at CCC from May 2005 through August 2, 2005. (Tr. 373, 381). Plaintiff's records during this time indicate that he appeared to have benefitted from hospitalization and psychiatric medication (Tr. 380), was engaged in the therapeutic process with symptoms that appeared to be improving (Tr. 379), had a decreased severity of symptoms of depression (Tr. 377), and had fragile sobriety with acknowledged cravings. (Tr. 375). During Plaintiff's last session at CCC on August 2, 2005, the record indicated that Plaintiff abruptly left the office after showing up for an unscheduled session and being shown to the waiting area. (Tr. 373). It appears that Plaintiff's therapist then called the Plaintiff that same day and Plaintiff alternated between being silent or curt and then abruptly hung up the phone. (Tr. 373-374).

It also appears that Plaintiff was treated by Reena Camoens, M.D., approximately four times during June and July, 2005. Dr. Camoens reported that Plaintiff's mood remained improved on medications (Tr. 392, 394). Further, Plaintiff reported that he had no auditory hallucinations during that time. (Tr. 394). Lastly, Plaintiff stated that he did not feel as overwhelmed as he once did, that he could control any violent impulses he had, and that he still regularly attended NA meetings and had been sober for 7 years. (Tr. 392).

### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

12

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6ᵗʰ Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6ᵗʰ Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6ᵗʰ Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6ᵗʰ Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6ᵗʰ Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6ᵗʰ Cir. 1985).

B.  Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)     If the claimant is working and the work constitutes substantial gain activity, benefits are automatically denied.

13

(2)     If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)     If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[5] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4)     If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)     Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the valuation process can be carried by relying on the medical vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id*. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir.

---

[5]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

14

1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423 (d)(2)(B).

## C.   Plaintiff's Statement of Errors

Plaintiff alleges four errors in the ALJ's decision: (1) the ALJ improperly discounted Plaintiff's testimony as less than credible regarding the severity and persistence of his pain and symptoms; (2) that the ALJ failed to give proper weight to the opinion of Dr. Williams; and (3) that the VE's testimony was inadequate as it did not specifically articulate any of Plaintiff's non-exertional impairments and that the ALJ erred in his application of the Medical-Vocational Guidelines ("Grids").  Plaintiff also appears to suggest that (4) this case should be remanded so that the Plaintiff can receive a mental evaluation to determine if he has a mental impairment.

With respect to Plaintiff's first argument, the Plaintiff disputes the amount of credibility given to his testimony by the ALJ at the October 19, 2004, hearing concerning his pain and impairments and their impact on his ability to work.  An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility.  *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997)(citing 42 U.S.C.A. § 423 and 20 C.F.R. §404.1529(a)). Further, discounting the credibility of a claimant is appropriate to a certain degree where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence.  *Id.*  In the instant case, the ALJ noted that while the medical evidence revealed that the Plaintiff had been

15

diagnosed with underlying conditions, including a history of compression fracture of the lumbar spine status post fusion, degenerative disc disease and depression; the objective medical evidence did not support the testimony of the claimant as to the severity and persistence of his pain and other symptoms. (Tr. 18-19). The Magistrate Judge agrees with the ALJ's findings on the issue of Plaintiff's credibility.

The ALJ evaluated Plaintiff's testimony regarding the severing of his pain and limitations in accordance with the regulations and reasonably determined that Plaintiff's testimony was not entirely credible. (Tr. 18-20). In contrast to Plaintiff's assertion in the instant motion, the ALJ did not base his credibility determination solely upon a single note in Dr. Mackey's records that directly states that Plaintiff could return to full work duty without restrictions. The ALJ reviewed all of the objective evidence in the record and found that Plaintiff's testimony was simply not supported. The ALJ noted that while the Plaintiff's conditions are severe and there is no question that Plaintiff was unable to perform at any level of physical exertion during the recuperative period following his back injury, the record establishes that Plaintiff gradually improved within twelve months of his accident. (Tr. 19).

Upon review of Dr. Mackey's treatment notes, in addition to those of Dr. Boatright and Dr. Lane and physical therapy treatment notes as well as Plaintiff's own testimony, the ALJ's conclusion is clearly substantiated. On December 9, 2002, approximately one month after Plaintiff's accident, Dr. Mackey noted that Plaintiff was "doing well" and "getting around quite nicely." (Tr. 187). On month later, on January 6, 2003, Dr. Mackey noted that Plaintiff's's "x-rays look great" and that Plaintiff's "only complaint was of some discomfort along his incision." (Tr. 186). A little over a month later and approximately three months after Plaintiff's accident, on February 17, 2003, Dr.

16

Mackey noted that Plaintiff had "no neurologic complaints, no back pain to speak of." (Tr. 185). Further, Dr. Mackey noted that while Plaintiff was still unable to do any type of heavy lifting, he could find a "light duty type job or sedentary type job" while continuing to work on progressive strengthening. (Tr. 185). On April 14, 2003, approximately six months after Plaintiff's accident, Dr. Mackey noted that Plaintiff, while still having abdominal weakness, was doing well with minimal back pain. (Tr. 184). Dr. Mackey also writes that "I have encouraged him to gradually return to full duty without restrictions." (Tr. 184). Two months later, and seven months after Plaintiff's accident, on June 24, 2003, Dr. Mackey reported that Plaintiff was "doing okay. . .having a little bit of low back discomfort. . .AP Lateral lumbar spine look fine. The fusion of his burst fracture looks fine." (Tr. 183). Dr. Mackey concluded that, "Symptomatically he is doing reasonably well. No further recommendations for him. Activities as tolerated." (Tr. 183).

On March 28, 2003, Plaintiff's physical therapy discharge summary reported that Plaintiff had a pain level of one, the lowest minimal pain level on the scale and strength rating of 5/5. (Tr. 249). Additionally, on January 14, 2004, over one year after Plaintiff's accident, the Plaintiff was seen by Dr. Boatright, reporting neck and back pain and an inability to sleep at night. (Tr. 245). Plaintiff stated that his pain was uncomfortable but not unbearable and that the pain was not limiting his daily activities. (Tr. 245). Further, the ALJ correctly noted that Plaintiff's pain was controlled with non-narcotic and anti-inflammatory medication. (Tr. 183, 245).

Further, on August 1, 2003, Plaintiff reported to Dr. Lane that he did not have any difficulties with his appetite, enjoys going to the movies, eating out at restaurants, and that he spends his days watching television, reading, listening to the radio, playing checkers with his son, and visiting friends. (Tr. 191). Further, Plaintiff reported that he regularly attended NA meetings in the

17

evening and would then come home and make himself dinner. (Tr. 191). Plaintiff additionally reported that he attends church on Sundays. (Tr. 192). Plaintiff also reported that he manages his own finances, prepares his own meals, does his own laundry, bathes daily, makes his own clothing purchases, and runs his own errands by driving himself. (Tr. 192). Dr. Lane also noted that Plaintiff traveled unaccompanied in unfamiliar places and used public transportation. (Tr. 192). Further, Plaintiff testified at the hearing on October 19, 2004, nearly two years after his accident, that he does his own laundry, regularly attends NA meetings, visits friends, goes to the movies or dines out, attends church, participates in church activities, washes dishes, takes care of his personal hygiene, runs his own errands, and maintains his own vehicle. (Tr. 410, 411, 415, 416).

As such, the ALJ properly afforded the correct weight to the credibility of Plaintiff's testimony regarding his complaints as to the severity and persistence of his pain and symptoms.

The Magistrate Judge next considers Plaintiff's second statement of error: that the ALJ failed to give proper weight to the opinion of Dr. Williams, which directly conflicts with the opinion of Dr. Lane. Plaintiff asserts that the ALJ failed to reference Dr. Williams' PRTF and MRFC in his decision. While the Magistrate Judge finds that the Plaintiff correctly notes that no reference was made to Dr. Williams' reports in the ALJ's decision, the Magistrate Judge must again, contrary to Plaintiff's assertions, disagree with the Plaintiff that Dr. Williams' reports directly contradict Dr. Lane's report, which is referenced by the ALJ. Further, there is no evidence anywhere in the record or in the pleadings which establishes Plaintiff's assertion that the ALJ failed to reference Dr. Williams' reports because they were illegible. The Magistrate Judge had no problem reviewing and utilizing Dr. Williams' reports, the majority of which are in a standard, check the box format.

Dr. Williams concluded that Plaintiff "could understand and carry out simple-detailed tasks

18

while sitting along with others, and adapting at that level of functioning. Mood personality could limit response to criticism and p/c/c such that he could have trouble with complex task and dealing with public in more than simple situations." (Tr. 200). Dr. Lane concluded that Plaintiff is "able to understand simple instructions, make simple-work related decisions, work with the general public and co-workers, accept criticism from supervisors, and maintain schedules and attendance." (Tr. 192). These do not directly conflict as both conclusions demonstrate that Plaintiff can carry out simple tasks in a work environment.

Further, Dr. Williams found that Plaintiff could remember locations and work-like procedures, understand and remember short and very simple, as well as detailed, instructions, carry out very short and simple instructions, would be moderately limited in his ability to carry out detailed instructions, would be moderately limited in his ability to maintain attention and concentration for extended periods, could perform activities within a schedule, maintain regular attendance, be punctual within normal customary tolerances, could sustain an ordinary routine without special supervision, had the ability to work in coordination with or proximity to others without being distracted by them, had the ability to make simple work-related decisions, and would be moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 198-199). Further, Dr. Williams found that Plaintiff's ability to interact appropriately with the general public was moderately limited, as was his ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 199). Dr. Williams also found that Plaintiff had the ability to ask simple questions or request assistance, to get along with coworkers, maintain socially appropriate behavior, to respond appropriately to

19

changes in a work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (Tr. 199). Nowhere in his reports did Dr. Williams find that Plaintiff had any marked or extreme degrees of functional limitations which would satisfy the functional criterion or any markedly limited mental activities. (Tr. 196, 198, 199). Therefore, Dr. Williams reports do not conflict, as Plaintiff asserts, with those of Dr. Lane.

Further, an ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). There is evidence in the record that Dr. Lane met with the Plaintiff for at least one visit. (Tr. 190). There is no evidence in the record that Dr. Williams ever treated or met with Plaintiff. Therefore, the ALJ properly afforded the proper weight to Dr. Lane's opinion and the failure to reference Dr. Williams' report does not establish, as Plaintiff asserts, that the ALJ's decision is not supported by substantial evidence. Further, Dr. William's report does not directly conflict with that of Dr. Lane.

The Magistrate Judge next addresses Plaintiff's third statement of error: that the VE's testimony was inadequate as it did not specifically articulate any of Plaintiff's non-exertional impairments and that the ALJ erred in his application of the Grids. It is unclear whether Plaintiff is referencing his mental impairments or his HIV and Hepatitis B status. In an abundance of caution, the Magistrate Judge will consider both.

Once the ALJ determined that Plaintiff did not have the residual functional capacity to perform his past relevant work, the burden shifted to the Secretary to show that Plaintiff possesses the capacity to perform other substantial gainful activity that exists in the national economy, taking

into consideration present job qualifications such as age, experience, education, and physical capacity and the existence of jobs to match those qualifications. *Varley,* at 779; *Moon,* at 1181. The Secretary may meet this burden by reference to the Grids unless the claimant suffers from nonexertional limitations that significantly limit the range of work permitted by his exertional limitations. *Cole v. Secretary of Health & Human Services*, 820 F.2d 768, 771 (6th Cir. 1987). The mere presence of a mental impairment does not preclude reliance upon the grid regulations unless the mental impairment results in functional limitations which significantly limit the ability to perform work at a particular exertional level. *Moon,* at 1182. Further, while the grid in such cases may not be used to direct a conclusion, it can be used as a guide to the disability determination. *Id.*

In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley at* 779. Lastly, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423 (d)(2)(B).

The Magistrate Judge previously considered the severity of Plaintiff's mental nonexertional limitations in the context of the weight given to Dr. Lane's vs Dr. Williams' reports. For those reasons articulated previously, the Magistrate Judge concludes that the ALJ's finding that Plaintiff's's nonexertional mental impairments are not severe enough to alter the conclusion that Plaintiff retains the RFC to perform light work with no more than occasional climbing of ramps and stairs, balancing, stopping, kneeling or crouching, or climbing of ladders, ropes or scaffolds, and the work must require no more than simple, routine, repetitive tasks, is supported by the record. (Tr.

20-21). Plaintiff's psychiatric treatment record as well as the reports of state agency doctors in addition to Plaintiff's own testimony demonstrate that his mental impairments do not markedly restrict his daily living activities or his ability to work with the limitations described immediately above.

Further, while the ALJ referred to the grids for guidance, this was not his entire basis in making his disability determination. The ALJ also found that the Plaintiff's ability to perform all or substantially all of the requirements of light work was, in fact, impeded by additional exertional and/or non-exertional limitations. (Tr. 22). Therefore, the ALJ requested the testimony of a VE, as is proper in such cases where the grids do not direct a conclusion as to the claimant's disability. *See Varley at* 779. To rebut the Plaintiff's *prima facie* case, the ALJ examined the VE, who provided particularized proof of the claimant's individual vocational qualifications to perform specific jobs. *Id*. As such, the ALJ found that the Plaintiff was not disabled because he could have performed other work as identified by the VE. Specifically, the VE stated that the Plaintiff could perform light work as a hand packer, assembler, cashier, cuff folder and/or surveillance system monitor. (Tr. 421-422).[6] Therefore, the ALJ correctly referred to the grids and the testimony of the VE in making his disability determination, which is supported by substantial evidence in the record..

As to Plaintiff's HIV and Hepatitis B status, there is no evidence in the record that Plaintiff is currently suffering from any opportunistic infections or any other health issues associated with these diseases which would prevent him from working. Further, Plaintiff has not claimed that there is new, material evidence of such health issues which would establish that Plaintiff's HIV and

---

[6]See pages 10-11 of this Report and Recommendation for the exact number of positions as well as a complete summary of the VE's testimony at the October 19, 2004, hearing.

Hepatitis B status effects his ability to work and would thus warrant remand pursuant to Section Six of 42 U.S.C. § 405(g).[7]  Plaintiff's blanket assertion that Plaintiff's HIV and Hepatitis B status alone would have affected the VE's testimony is insufficient.

With respect to Plaintiff's final argument, the ALJ does have a basic obligation to develop a full and fair record.  *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051-1052 (6th Cir. 1983).  Plaintiff alleges that this case should be remanded so that the Plaintiff can receive a mental evaluation to determine if he has a mental impairment.  However, a claimant bears the burden of providing a complete record establishing disability and the Secretary is not required to order consultative examinations unless they are necessary for the ALJ to make a disability determination. 20 C.F.R. § 404.1512; *Landsaw v. Sec'y of Health and Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).  With that said,  the ALJ ordered a consultative psychological examination of the Plaintiff and then developed the record even further by having an additional state medical consultant review the entire record, including the consultative examination. (Tr190-192, 193-200).  Therefore, the ALJ consulted with two separate medical advisors regarding Plaintiff's mental impairments.  Further, the ALJ held an administrative hearing where the Plaintiff gave significant testimony about his daily activities and a VE testified.  (Tr. 401-425).  Additionally, the ALJ reviewed questionnaires from both the Plaintiff and his mother.  (Tr. 119-126).  There are also other substantial medical records

---

[7]Remand for consideration of new and material evidence is appropriate only if the material evidence relates to the claimant's condition at the time of the administrative proceedings and if the claimant shows good cause for failing to submit the evidence during the administrative proceedings.  42 U.S.C. § 405(g); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 149 (6th Cir. 1996); *Oliver v. Sec'y of Health and Human Servs.*, 865 F.2d 709,712 (6th Cir. 1988); *Willis v. Sec'y of Health and Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). Further, to satisfy the statutory requirement of "materiality," the proponent of the new evidence must show a "reasonable probability" that the Commissioner would have reached a different conclusion on the issue of disability if presented with the new evidence.  *Willis*, 727 F.2d at 554.

23

in evidence from Plaintiff's treating physicians.

The ALJ reviewed the consulting examiners findings in detail which diagnosed the Plaintiff with depression. (Tr. 17-18). However, both examiners also found that Plaintiff's mental impairment would not preclude him from working, with the limitations as previously discussed. With these limitations, the VE found that there were significant jobs the Plaintiff could perform. (Tr. 421-422). Further, the most recent treatment notes submitted to the AC indicate that Plaintiff's condition is and/or can be controlled by medication. (Tr. 312, 377, 379, 380, 392, 394). An impairment that can be remedied by treatment with reasonable effort and safety cannot support a finding of disability for social security purposes. *Henry v. Gardner*, 381 F.2d 191 (6th Cir. 1967); *Johnson v. Secretary of Health and Human Services*, 794 F.2d 1106 (6th Cir. 1986).

Given the above, the Commissioner is not required to elicit additional evidence to determine the effect of Plaintiff's mental impairment, as the ALJ already had a sufficient medical history before him and his decision is supported by substantial evidence in the record. The ALJ discussed the evidence in detail to support his findings and amply explained the reasoning which supported his determination.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall

have ten (10) days from receipt of any objections filed in which to file any responses to said

objections. Failure to file specific objections within ten (10) days of receipt of this Report and

Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v.*

*Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004 (en banc).

ENTERED this 8th day of March, 2007.


/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge

Case 3:06-cv-00221   Document 24   Filed 03/08/07   Page 25 of 25 PageID #: 85